# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-KA-01472-SCT

**EDWARD YOUNG a/k/a EDWARD YOUNG, JR.**
**a/k/a BALD HEAD**

**v.**

**STATE OF MISSISSIPPI**


| | |
|---|---|
| DATE OF JUDGMENT: | 05/19/2016 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS |
| TRIAL COURT ATTORNEYS: | MARVELL MAURICE GORDON |
| | RICHARD CLARENCE CARTER |
| | AKILLIE MALONE-OLIVER |
| COURT FROM WHICH APPEALED: | HOLMES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: ERIN ELIZABETH BRIGGS |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOSEPH SCOTT HEMLEBEN |
| DISTRICT ATTORNEY: | AKILLIE MALONE-OLIVER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/30/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     Following a jury trial, Edward Young was convicted of murder in the Holmes County Circuit Court.  Young, through appellate counsel, appeals his conviction, claiming the trial court erred in denying his motion for a new trial based on the ground that the jury's guilty verdict was against the overwhelming weight of the evidence.

¶2. Young also submits a supplemental appellant's brief pro se claiming: he was denied a timely initial appearance following his arrest; the trial court improperly instructed the jury with regard to his alibi defense; and he was denied effective assistance of trial counsel and appellate counsel. Having considered the issues and accompanying arguments based on the record, we affirm Young's conviction.

**FACTS**

¶3. On the afternoon of November 29, 2014, Keith Young was driving around Tchula, Mississippi, with his brother, Kelvin Young, and his friend Travis Anderson. At some point, Keith dropped Kelvin off at a social gathering at Kelvin's girlfriend's sister's house in the Gwin community. Keith and Anderson continued to ride around, eventually parking off Highway 49.

¶4. While the two men were sitting in the car talking they saw Keith's cousin, Edward Young (Edward), also known as "Bald Head," walking toward the vehicle. As Edward approached the vehicle, Keith said "Bald Head, what's up?" Edward did not respond and continued toward the car. Anderson rolled down the passenger window of the car and Edward called Anderson's name two or three times. Both men saw that Edward was holding a gun and Anderson tried to lock the door; but Edward "snatched the door open" and shot Anderson. Upon being shot, Anderson pushed Keith out of the driver's seat as Keith was opening the driver's side door. Anderson exited the vehicle and ran onto the highway, where he collapsed. Keith initially fled the car but then ran back to the car and drove away.

¶5.     Keith first drove to the police station, but no one was there. Keith then drove to the house in Gwin where he had dropped off his brother, Kelvin. According to Keith, he told Kelvin and others what had happened. Kelvin then drove Keith to their parents' house.

¶6.     Keith there told his parents what had happened. Keith's father then drove Keith back to the scene of the shooting, where Keith talked to a sheriff's deputy present at the scene. The deputy told Keith to go to the Holmes County Sheriff's Department in Lexington, Mississippi, where Keith then gave a statement to authorities.

¶7.     Meanwhile, shortly after the shooting, Officer Willie Phillips of the Tchula Police Department received a report of a person lying in the highway. Officer Phillips, along with Officer Freddy Sheard, responded to the scene. When they arrived, Officer Phillips found a man, later identified as Travis Anderson, lying in the southbound lane of Highway 49. Anderson was still alive, and an unidentified woman was performing cardiopulmonary resuscitation (CPR) on him. An ambulance arrived a short time later, and Anderson was pronounced dead.

¶8.     Edward was developed as a suspect and Officer Phillips was instructed by his superior to locate him. Officer Phillips, accompanied by Officer Sheard, proceeded to Edward's residence. After the officers knocked on the door and announced themselves, Edward opened the door and stated "I know y'all was coming" and "I didn't do it." Edward then was taken into custody.

¶9.     Holmes County Sheriff's Deputy Sam Chambers led the investigation into the death of Anderson. When Deputy Chambers arrived at the crime scene, Anderson already had

expired. Deputy Chambers viewed the body and observed a gunshot wound to Anderson's neck. After being informed by other officers that a man known as "Baldhead" was a suspect, Deputy Chambers instructed the officers to pick him up and bring him in for questioning.

¶10. Deputy Chambers also learned that Keith was an eyewitness to the shooting and was at the Holmes County Sheriff's Department. Deputy Chambers left the scene and went to interview Keith. Deputy Chambers took a recorded statement from Keith, and he also had Keith bring his vehicle to the Holmes County Sheriff's Department, where it later was processed for evidence.

¶11. After being taken into custody, Edward was brought to the Holmes County Sheriff's Department, where he was interviewed by Deputy Chambers. Edward denied any involvement in the shooting and claimed he had been at home watching a football game with his brother and mother.

¶12. Deputy Chambers administered a gunshot residue (GSR) kit on Edward's hand, which Deputy Chambers later submitted to the Mississippi State Crime Laboratory. The clothes Edward was wearing at the time of his arrest also were collected and submitted to the crime lab.

¶13. On November 30, 2015, Edward was indicted by a Holmes County grand jury for first-degree murder. On April 22, 2016, Edward filed a motion to dismiss, alleging that the State had failed to turn over the results of the GSR testing performed on Edward's hand, and the State was claiming the GSR kit had been lost or destroyed.

¶14.    A hearing on the motion was held on April 25, 2016.  During the hearing, the trial court heard argument from counsel, during which it was established that the GSR kit had in fact been lost.  According to the State, Deputy Chambers had submitted the GSR kit to the state crime lab, which sent the kit back and informed Chambers that it could not process that particular type of kit.  Deputy Chambers then placed the kit in the evidence room and, as of the day of the hearing, had not been able to locate the kit. The trial court reserved ruling on the motion and requested written memoranda on the matter.

¶15.    On May 5, 2016, Edward filed a motion to allow for additional testimony regarding the missing GSR kit.  A hearing on the motion was held that same day.  During the hearing, Edward argued that, even though the State had stipulated at a previous hearing the GSR kit had been lost or misplaced, the defense wished to get an account of what had transpired on the record.  The trial court granted the motion and the defense called Deputy Chambers to testify.

¶16.    Deputy Chambers testified that, on or about November 28, 2014, Edward was arrested and Deputy Chambers administered a GSR kit on Edward's hand.   According to Deputy Chambers, upon administering the kit, he locked the kit in his desk drawer.  The following week, Deputy Chambers transported the GSR test kit, along with other evidence, to the state crime lab.  The lab returned the kit that same day and informed Deputy Chambers that it was unable to process that particular type of GSR kit.  Deputy Chambers then placed the GSR kit in the evidence room until he could find a lab that could process that particular kit.  But when Deputy Chambers went to retrieve the kit at a later date, he was unable to locate it.  Deputy

5

Chambers testified that, to the best of his knowledge, the kit was lost when the evidence room clerk cleaned the evidence room. Deputy Chambers further testified that he did not instruct anyone to destroy any evidence.

¶17. On May 16, 2016, the trial court entered an order denying Edward's motion to dismiss. The trial court found that the GSR kit was not intentionally or through bad faith, misplaced or destroyed, but was lost due to negligence that did not rise to the level of bad faith. The trial court ruled, however, that Edward would be permitted to question law enforcement about the lost or misplaced evidence at trial.

¶18. In the same order, the trial court also precluded the State from introducing any evidence pertaining to Edward's confession to police, due to the State's late disclosure of said confession.

¶19. Edward was found guilty of first-degree murder by a Holmes County jury in May 2016. Edward thereafter timely appealed his conviction to this Court.

¶20. Through appellate counsel from the Office of Indigent Appeals, Edward claims the trial court erred in failing to grant his motion for a new trial based on the verdict being against the overwhelming weight of the evidence. Edward also filed a supplemental appellant's brief pro se, claiming: (1) an untimely initial appearance after his arrest; (2) improper jury instructions; and (3) ineffective assistance of counsel by his trial counsel and appeal counsel.

¶21. Additional facts as necessary will be related in our discussion of the issues.

**ANALYSIS**

6

## I. Whether the trial court erred in declining to grant a new trial based on the claim the jury's verdict was against the overwhelming weight of the evidence.

¶22. "The standard of review of a post-trial motion is abuse of discretion." *Flowers v. State*, 601 So. 2d 828, 833 (Miss. 1992). When reviewing a challenge to the weight of the evidence, this Court considers the evidence in the light most favorable to the verdict, and the State receives all favorable inferences that reasonably may be drawn from the evidence. *Hughes v. State*, 983 So. 2d 270, 277-78 (Miss. 2008). This Court will not order a new trial unless it is convinced that the verdict so contradicts the overwhelming weight of the evidence that to allow the verdict to stand would sanction an unconscionable injustice. *McNeal v. State*, 617 So. 2d 999, 1009 (Miss. 1993).

¶23. Edward argues that the State's evidence was based on the testimony of a lone eyewitness that Edward was the shooter in this case. But, he says, no forensic evidence tied Edward to the shooting; police failed to investigate Keith, who was with Anderson at the time of his death; and police also failed to investigate Kelvin, Keith's brother, who had admitted he was at a store located less than a couple of hundred yards away from where Anderson was shot, at around the time the shooting occurred.

¶24. Edward further contends that at every turn in the investigation of this case, law enforcement committed misstep after misstep. He contends law enforcement failed to interview Edward's alibi witnesses, who would have verified Edward was home watching television at the time of the shooting. And Deputy Chambers knew how important GSR test results would be to the investigation; yet the results of this material evidence never made it

7

to trial because Deputy Chambers had lost the kit before it was ever tested. Further, officers took the clothing Edward was wearing when he was arrested and sent it to the crime lab for testing. The crime lab was asked to test Edward's clothing for the presence of DNA. At the lab, the serologist found one spot that appeared to be blood. Once tested, however, the lab learned the bloodstain did not come from Anderson. The crime lab also tested for GSR on the red polo shirt Edward was wearing at the time of his arrest, but the test came back negative.

¶25. Edward also argues that at trial, the State contended that Edward was photographed wearing a black jacket at the time he was arrested at his home. Yet the jacket was never tested for DNA or GSR by the lab.

¶26. Edwards contends further that the jury heard inadmissible information at trial when the State attempted to elicit testimony from Kelvin that his brother Keith had named Edward as the shooter shortly after the shooting. At the time Keith allegedly told Kelvin that Edward was the shooter, Keith was shaking and crying. The State wanted to get this information into evidence under the excited-utterance exception to the hearsay rule. But according Kelvin's testimony, Kelvin did not receive this information from his brother. Instead, after the shooting, Kelvin's sister-in-law called him and said that Edward had shot Anderson. The defense objected to Kelvin's testimony on the grounds it constituted hearsay within hearsay. Edward argues that, although the trial court sustained the objection, the jury already had heard the testimony. Edward claims this information was particularly detrimental and prejudicial since the only evidence tying Edward to the shooting was Keith's testimony.

¶27. Edward submits that for these reasons, the jury's verdict was based on extremely weak evidence, and to allow his conviction to stand would amount to an unconscionable injustice.

¶28. We disagree. Testimony of a single witness is enough to support a conviction, even though denied by the accused. *Nash v. State*, 278 So. 2d 779, 780 (Miss. 1973). The jury need not be controlled by the number of witnesses testifying to the identification of an accused. *See Groseclose v. State*, 440 So. 2d 297, 300 (Miss. 1983) (noting that the weight given to testimony is not determined by the number of witnesses).

¶29. Keith testified that his cousin Edward was responsible for shooting Anderson. Keith identified Edward as the shooter shortly after the shooting occurred and again at trial. Any problems with law enforcement's investigation into the case, including the loss of GSR evidence and failure to test the jacket Edward was wearing at the time of his arrest, was for the jury to contend with along with the weight and credibility of Keith's testimonial evidence. The absence of physical evidence does not negate a conviction where there is testimonial evidence. *Williams v. State*, 512 So. 2d 666, 670 (Miss. 1987).

¶30. This Court has held that when a defendant claims he is entitled to a new trial based on lost or destroyed evidence, we employ a two-part test. *Cox v. State*, 849 So. 2d 1257, 1266 (Miss. 2003). "First, it must be determined whether the evidence would have played a significant role in the defendant's case. To play a significant role, the exculpatory nature and value of the evidence must have been apparent before the evidence was lost." *Id*. Second, the test requires "that the defendant have no way of obtaining comparable evidence by other means." *Id*.

9

¶31.    "The intentional spoliation or destruction of evidence raises a presumption or inference that the evidence would have been unfavorable to the case of the spoilator." *Id*. But, "[s]uch a presumption or inference arises, however, only where the spoliation or destruction was intentional and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent." *Id*. (quoting *Tolbert v. State*, 511 So. 2d 1368, 1372-73 (Miss. 1987)). "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process." *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)).

¶32.    Here, the trial court found that the GSR kit was not intentionally or through bad faith misplaced or destroyed by the Holmes County Sheriff's Department. Rather, it was lost due to negligence that did not rise to the level of bad faith. We find no abuse of discretion in the trial court's finding. The trial court allowed Edward to question law enforcement at trial about the lost evidence, and about law enforcement's overall investigation of the case.

¶33.    Further, while certainly not insignificant evidence, we also cannot say that the GSR kit was crucial to the State's case. In *Goff v. State*, 14 So. 3d 625, 648-49 (Miss. 2009), this Court found that the fact a wallet that allegedly was stolen from the victim was never tested for fingerprints and/or biological evidence did not preponderate against the jury's guilty verdict for capital murder with the underlying offense of robbery. The *Goff* Court explained that the fact no tests were conducted on the wallet for fingerprints and/or other biological

10

evidence presented "factual questions, with attendant inferences that could have led in any number of directions, for the jury to resolve." *Id*. at 649.

¶34. We find the same here. Even if the GSR results had been tested and came back negative, the jury still could conclude that Edward shot Anderson based on other evidence in the case. Therefore, we find no merit in this point of contention.

¶35. As for Edward's claim that law enforcement did not interview alibi witnesses who would have placed Edward at home watching football on television when the shooting occurred likewise was for the jury to contend with; we find no merit in it. Such testimony was presented at trial during Edward's defense, and it was for Edward's jury to accept or reject. "[T]he jury is the judge of the weight and credibility of testimony and is free to accept or reject all or some of the testimony given by each witness." *Meshell v. State*, 506 So. 2d 989, 992 (Miss. 1987).

¶36. We also find no merit in Edward's claim that he was prejudiced because the jury had heard inadmissible information from Kelvin's testimony that Kelvin had heard through his sister-in-law, and not Keith, that Edward had shot Anderson.

¶37. First, Edward did not object to this testimony on the ground it was prejudicial; rather, defense counsel claimed it constituted hearsay within hearsay. "Objection on one ground at trial waives all other grounds for objection on appeal." *Carter v. State*, 722 So. 2d 1258, 1261 (Miss. 1998); *see also* *Rubenstein v. State*, 941 So. 2d 735, 758 (Miss. 2006) (finding that, because defense counsel did not object at trial on the basis that question was prejudicial,

but rather leading, argument on appeal that it was prejudicial was deemed waived for appellate review).

¶38. Second, the trial court sustained both Edward's objection and his request that the jury be instructed to disregard the complained-of testimony. The jury is presumed to follow instructions from the trial court; to presume otherwise would render the jury system inoperable. *Pitchford v. State*, 45 So. 3d 216, 240 (Miss. 2010).

¶39. Third, the jury could have rejected Kelvin's testimony altogether, and even Keith's testimony regarding what Keith did or said to whom following the shooting, and still conclude that Edward shot and killed Anderson based solely on Keith's identification of Edward as the shooter.

¶40. Viewing the evidence in the light most favorable to the verdict, whatever inconsistencies existed in the case were minor and inconsequential and belonged to the jury to weigh and consider. *Meshell*, 506 So. 2d at 992. The only evidence presented by the defense that contradicted Keith's version of events was the alibi testimony given by Lorenzo Young, Edward's brother, who testified that Edward was home watching football on television at the time of the shooting. The jury obviously rejected this testimony, and it was within its prerogative to do so. Based on our review of the record, we find the verdict in this case was not so unconscionable as to require a new trial. Accordingly, this assignment of error is without merit.

> **II.  Whether Edward was denied a timely initial appearance after his arrest.**

12

¶41. Edward asserts pro se that the first time he was taken before any judge after being arrested in 2014 for murder was on February 9, 2016, for an arraignment. Edward contends this is a lapse of more than a month from the time his indictment for murder was handed down by the grand jury on November 30, 2015. Edward argues this a violation of his fundamental rights and his conviction cannot stand on such a violation. Edward cites *Abram v. State*, 606 So. 2d 1015 (Miss. 1992), *overruled on other grounds*, in which this Court held that failure to provide the defendant with an initial appearance constituted reversible error.

¶42. It is unclear whether Edward claims he was denied an initial appearance or just a timely arraignment. The record provides nothing by which to determine whether Edward did or did not have an initial appearance. The docket-sheet time line begins with the date of Edward's indictment. And no reference to an initial appearance is contained anywhere in the record.

¶43. That said, Rule 6.03 of the Mississippi Uniform Rules of Circuit and County Court provides that "every person in custody shall be taken, without unnecessary delay and within 48 hours of arrest, before a judicial officer . . . for an initial appearance." The "'major purpose 'of the initial appearance' is to secure to the accused prompt . . . advice of his right to counsel by a judicial officer[. . .]'" and "it is imperative that the initial appearance be given 'without unnecessary delay' as the rule commands." *Abram*, 606 So. 2d at 1029 (quoting *Nicholson v. State*, 523 So. 2d 68 (Miss. 1988) (Robertson, J., concurring)).

¶44. But as the Court of Appeals has pointed out, "[w]hile the rule provides for a timely initial appearance, the failure to provide an initial appearance for the accused within

13

forty-eight hours does not itself mandate reversal of his or her convictions, where there is no resulting prejudice." ***McClendon v. State***, 124 So. 3d 709, 714 (Miss. Ct. App. 2013) (citing ***Johnson v. State***, 749 So. 2d 306, 308 (Miss. Ct. App. 1999)).

¶45. Here, as mentioned, nothing in the record supports Edward's claim that he was denied a timely initial appearance. But even if a delay occurred, Edward fails to explain how any such delay prejudiced his defense at trial.

¶46. In ***Abram***, this Court found that failure to provide the defendant a timely initial appearance resulted in the defendant giving "a confession in the absence of, and violation of, his right to counsel." ***Abram***, 606 So. 2d at 1029. This failure, according to the ***Abram*** Court, "had devastating consequences for the defense, clearly derogating from [the defendant's] right to a fair trial." ***Id***.

¶47. Accordingly, we find ***Abram*** inapplicable to this case based on the record and Edward's failure to articulate any prejudice that may have resulted, if in fact he did not receive a timely initial appearance.

¶48. Rule 8.01 of the Uniform Rules of Circuit and County Court Practice provides that "[a]rraignment unless waived by the defendant, shall be held within (30) days after the defendant is served with the indictment . . . . Arraignment is deemed waived when the defendant proceeds to trial without objection."

¶49. The record does not reveal why Edward's arraignment was not held within thirty days, as required by Rule 8.01. The record shows no objection by the defense to Edward's arraignment being held on February 6, sixty-nine days from when Edward's indictment was

served. Again though, Edward offers nothing in his argument on appeal as to how or why he was adversely affected by not having an arraignment within thirty days after being served with his indictment. For the same reasons just expressed, failure to provide an arraignment within thirty days of indictment does not itself mandate reversal of a conviction where no prejudice is shown.

¶50. This issue is without merit.

### III. Whether the jury was improperly instructed.

¶51. Edward contends the trial court committed reversible error when it improperly instructed the jury as to his alibi theory at trial. Edward contends the trial court should have "given a full two-step theory/version" with regard to his alibi defense, especially in light of the fact there was repeated reference to "his alibi of being home[,] watching the football game" on television.

¶52. Edward further claims that the State made repeated references to nonexistent evidence never admitted at trial and continuously made references to Edward "being home" with his clothes on. Edward argues that this Court continuously has held that where the State makes reference to a defendant personally when the defendant does not take the witness stand in his own defense, automatic reversal ensues.

¶53. Edward also asserts that the State made a comment during closing argument to "nonexistent evidence" that was so prejudicial the trial court told the State to "take it back." But the trial court failed to give a curative instruction.

¶54. This Court has held that when there is evidence before the jury in a criminal trial that would support an alibi defense, the defendant is entitled to a jury instruction as to how the law requires the jury to consider such evidence. *Young v. State*, 451 So. 2d 208, 210 (Miss.1984); *Sanford v. State*, 372 So. 2d 276, 279 (Miss. 1979); *Newton v. State*, 229 Miss. 267, 274-75, 90 So. 2d 375, 378 (1956).

¶55. Here, the record shows that the trial court did in fact grant Edward an alibi instruction, requested and drafted by Edward's defense counsel. Therefore, whatever complaint Edward may have with this particular instruction will not be considered by this Court on appeal. *See Long v. State*, 163 Miss. 535, 141 So. 591 (1932) (holding that an accused cannot complain of an erroneous jury instruction provided by the trial court at the accused's insistence or request, even if it conflicted with the State's instructions and was erroneous when applied to the facts of the case).

¶56. Next, Edward claims the State made references to him personally, which he claims were improper because he did not testify at trial. First, this Court has never held that the prosecution is not allowed to refer to a criminal defendant personally when a defendant does not testify at trial. The prosecution is allowed to (and must) do so throughout the trial when submitting its case and proof to the jury. What the prosecution cannot do is make reference to the fact that a criminal defendant did not testify in his own defense.

¶57. Both the Mississippi and United States Constitutions provide that no person may be compelled to take the witness stand against himself. *See* U.S. Const. amend. V; Miss. Const. art. 3, § 26. To protect this right, prosecutors are prohibited from making direct comments

on the defendant's failure to testify. *Wilson v. State*, 433 So. 2d 1142, 1146 (Miss. 1983). Prosecutors also are precluded from doing so "by innuendo and insinuation." *Id*.

¶58. But balanced against this constitutional interest "is the rule that attorneys are given wide latitude in their closing arguments." *Jimpson v. State*, 532 So. 2d 985, 991 (Miss. 1988). While a direct reference to the defendant's failure to testify is "strictly prohibited," all other statements must be looked at on a case-by-case basis. *Id*. There is a difference between a comment on the defendant's failure to testify and a comment on the failure to put on a successful defense. *Id*. The State is entitled to comment on the lack of any defense, and such a comment will not be construed as an insinuated reference to a defendant's failure to testify. *Strahan v. State*, 729 So. 2d 800, 807 (Miss. 1998).

¶59. Here, Edward fails to cite any specific instance in the record where the State commented–either directly or by insinuation–on Edward's failure to testify. From our review, the record does not reflect any such instance. The record illustrates that the prosecution made several statements during closing argument regarding evidence pertaining to Edward's clothing at the time authorities went to Edward's home after the shooting. The prosecution questioned whether such attire is characteristic of someone "who was sitting around all day watching football?" This was fair argument based on testimony and evidence in the case. *See Rogers v. State*, 796 So. 2d 1022, 1027 (Miss. 2001) (reiterating that prosecutors may comment upon any facts introduced into evidence and may draw whatever deductions and inferences that seem proper from the facts). Accordingly, this point of contention is without merit.

17

¶60. Lastly, Edward claims the State made a comment during closing argument that was so prejudicial that the trial court told the State to "take it back" but failed to give a curative instruction. The record shows that, during closing argument, the State commented on testimony from a defense witness, Dywana Broughton, who testified as an expert in the field of crime-scene investigations. The prosecution referred to her testimony as follows:

> Like I said before, Mr. Carter wants you to do a lot of guesswork in this case, and that's not what you're supposed to be doing. You know, we heard a lot about, like I said, a lot of CSI stuff. Defense presented experts. Now, what did you not hear about the expert witnesses? What wasn't brought out? Gunshot residue. There's a gunshot residue expert. Defense didn't put [her] up here to tell you about the residue found in the car.

¶61. At that point, defense counsel objected on the ground that this constituted "[i]mproper comment on something that's not in evidence." A bench conference then ensued as shown by the following colloquy.

MR. CARTER: [Broughton] said she recovered suspected possible gunshot residue. She did not do [an] analyzation [on] that[.]

THE COURT: As far as the gun residue?

MR. CARTER: Yes, ma'am.

THE COURT: In the car?

MR. CARTER: [Broughton] collected possible gunshot residue. That was the extent of it. She sent it to the crime lab after that.

THE COURT: She didn't do any analysis?

MR. GORDON: I thought it came after –

THE COURT: Huh-huh (negative response). Just take it back, okay?

18

Following the bench conference, the prosecutor apologized to the jury and told it to disregard what he had said because "that did not come into evidence."

¶62. First, the defense did not object on the ground that the statement was prejudicial. *See Carter*, 722 So. 2d at 1261. Nor did the defense request a curative instruction. Generally, our trial courts are not required to instruct the jury *sua sponte*. *See, e.g.*, **Rubenstein**, 841 So. 2d at 760-61 (reiterating that the trial court is not obligated to give a *sua sponte* limiting instruction).

¶63. Regardless, however, any wrong that occurred here was harmless beyond a reasonable doubt. The prosecutor retracted his statement in front of the jury. Moreover, the complained-of remarks or statements made by the prosecutor were wholly inconsequential when considered in light of the totality of the evidence.

¶64. For these reasons, this Court finds that this issue is without merit.

### IV. Ineffective Assistance of Counsel

¶65. Edward contends that he was denied constitutionally effective assistance of counsel both at the trial level and on direct appeal. Edward submits that trial counsel could not defend him to the best of counsel's ability due to the "purposeful spoliation of evidence by the police." Edward asserts "there was no trial court record of any lab-report submitted by the Mississippi Crime Lab" that defense counsel "could stand on, or fight against." In turn, appellate counsel could not argue an important issue that clearly should have been a part of the record. Edward further contends that appellate counsel failed to or refused to argue two

19

issues on appeal that trial counsel argued at trial and clearly stated in the post-trial motion filed by trial counsel.

¶66. This Court agrees with the State that the record does not manifestly show ineffectiveness of a constitutional dimension by either trial counsel or appellate counsel and that this claim is not appropriate for review at this time.

¶67. Generally, "ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Archer v. State*, 986 So. 2d 951, 955 (Miss. 2008). Reviewing courts are limited to the trial-court record when reviewing such claims and cannot address matters not fully enveloped within the record. *Id*. In such cases, "the appropriate procedure is to deny relief, preserving the defendant's right" to bring such a claim through a petition for post-conviction relief (PCR). *Id*. (citing *Read v. State*, 430 So. 2d 832, 837 (Miss. 1983)).

¶68. Here, Edward does not state with particularity how his trial counsel was ineffective; he merely complains about the evidence used against him and what is not contained in the record. He contends the same with regard to appellate counsel's representation, claiming appellate counsel likewise could not put forth an adequate appeal due to an insufficient record. Edward also fails to state what issues appellate counsel should have argued on appeal that trial counsel preserved in his post-trial motion.

¶69. Accordingly, we deny relief without prejudice to Edward's ineffective-assistance-of-counsel claims, allowing him the right to raise this argument in a timely-filed-post-conviction-relief motion, if he so chooses.

CONCLUSION

¶70.　For these reasons, we affirm Edward's conviction and sentence.

¶71.　**AFFIRMED.**

　　**WALLER, C.J., RANDOLPH, P.J., COLEMAN, MAXWELL, CHAMBERLIN AND ISHEE, JJ., CONCUR. KITCHENS, P.J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY KING, J., COLEMAN, J., JOINS IN PART.**

　　**KITCHENS, PRESIDING JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶72.　During closing argument, the prosecutor informed the jury of a fact not in evidence, specifically, that gunshot residue had been found in Keith Young's car, in which Travis Anderson had been sitting when he allegedly was shot and killed by Edward Young. In fact, no evidence had been adduced that investigators had discovered any gunshot residue in the car. Young objected and, instead of giving a curative instruction, the trial court employed a novel procedure by instructing the prosecutor to "take it back." Obediently, the prosecutor apologized to the jury and said "that did not come into evidence . . . I thought it did, but I'm . . . mistaken." The trial court never instructed the jury to disregard the prosecutor's erroneous factual representation. The majority declines to find error, instead concluding that "*any* wrong that occurred here was harmless beyond a reasonable doubt." Maj. Op. at ¶63 (emphasis added).

¶73.　I would hold that the prosecutor's reference to facts not in evidence was error, and a serious one. This Court has condemned other instances of prosecutors who argued facts not in evidence. "[A]rguing statements of fact that are not in evidence or necessarily inferable from it which are prejudicial to the defendant is error." *Slaughter v. State*, 815 So. 2d 1122,

1133 (Miss. 2002). If the trial court sustains an objection to the prosecutor's argument on facts not in evidence, then the trial court should instruct the jury to disregard the improper argument. *Gilbert v. State*, 48 So. 3d 516, 521 (Miss. 2010).

¶74. Here, the trial court did not instruct the jury to disregard the prosecutor's improper argument. Instead, the trial court employed the innovative remedy of instructing the prosecutor to "take it back." The prosecutor took this directive to mean that he should apologize to the jury, then say that he mistakenly had thought that gunshot residue test results from the car had come into evidence. That erroneously left the jury with the impression that gunshot residue evidence existed but somehow had not been brought to the jurors' attention. The jury was not instructed in any manner to disregard the prosecutor's erroneous reference to gunshot residue in the car. I would hold that the trial court erred by failing to instruct the jury to disregard the prosecutor's improper argument.

¶75. However, in the context of this case, I do find that the error was harmless beyond a reasonable doubt. Under harmless-error analysis, if it is clear beyond a reasonable doubt that an error did not contribute to the verdict, we will not set aside an otherwise valid conviction. *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Here, the question of whether there was a gunshot is not in dispute. All that the presence of gunshot residue in the car would have shown was that a firearm had been fired in or very near the car. It was well established by the testimony of Keith Young that Anderson was shot while sitting in the car, and the testimony of the forensic pathologist established that the autopsy evidence was consistent with Keith Young's description of the shooting. Although I disagree with the

22

majority's refusal to find error, on these facts, I agree that the prosecutor's improper argument was harmless beyond a reasonable doubt and, under a totality of the unique circumstances in this particular case, does not require reversal.

**KING, J., JOINS THIS OPINION.  COLEMAN, J., JOINS THIS OPINION IN PART.**