# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00764-COA

JUSTIN MITCHELL A/K/A JUSTIN LEE        APPELLANT
MITCHELL

v.

STATE OF MISSISSIPPI        APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 05/15/2023 |
| TRIAL JUDGE: | HON. WILLIAM HUNTER NOWELL |
| COURT FROM WHICH APPEALED: | TUNICA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/11/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND McCARTY, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     A Tunica County Circuit Court jury convicted Justin Mitchell of aggravated assault

for shooting Dawanna Johnson (Count I) and attempted aggravated assault for shooting at

Cordarryl Curtis (Count II).  The trial court sentenced Mitchell to serve consecutive terms

in the custody of the Mississippi Department of Corrections (MDOC) of twenty years for his

aggravated assault conviction and ten years for his attempted aggravated assault conviction.

The trial court also added a five-year firearm enhancement to each sentence pursuant to

Mississippi Code Annotated section 97-37-37(1) (Rev. 2020).

¶2.     On appeal, Mitchell asserts that (1) the evidence was insufficient to support his

attempted aggravated assault conviction (Count II); (2) the verdict on Count II was against the overwhelming weight of the evidence; and (3) the trial court erred in excluding evidence of Mitchell's alibi defense. Finding no error, we affirm Mitchell's convictions and sentences.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶3. Mitchell's three-day trial began on April 10, 2023.[1] Juanita Haynes testified that in 2021, she lived with her then-boyfriend Jamal Johnson at the Plantation Apartments in Robinsonville, Mississippi. Mitchell also began living with Haynes and Jamal. Mitchell slept on the living room couch. Haynes and Jamal were both listed on the lease. Mitchell was never listed on the lease. Jamal eventually moved out of the apartment, but Mitchell continued to live there. Haynes testified that for several months, she did not ask Mitchell to pay rent, but in July 2021, Haynes asked Mitchell to contribute to the cost of rent. Mitchell complied and gave Haynes six hundred dollars.

¶4. Haynes testified that later that same month, she received a phone call on her cell phone from Mitchell's mother. Haynes gave her cell phone to Mitchell so he could talk to his mother. When Haynes got her phone back, she noticed that her bank account app and "Cash App" were open and that money had been moved from her bank account to Cash App. At that point, she confronted Mitchell and asked him if he had sent himself money from her Cash App. Mitchell denied that he did.

¶5. Mitchell left the apartment, but he returned to the apartment later that day. Haynes

---

[1] The circumstances surrounding Mitchell's notice of an alibi defense and the trial court's pretrial ruling on the issue are discussed below.

testified that in addition to the money-transfer issue, she and Mitchell had been having other disagreements, so she asked Mitchell for his key to the apartment and told him that he had to move out. Haynes testified that Mitchell told her that he was not going anywhere.

¶6. Haynes then sought the help of the Tunica County Sheriff's Office to remove Mitchell from her apartment. Deputy James Payne Jr. arrived at Haynes's apartment a little before 6:00 p.m. that evening. Deputy Payne spoke with Haynes and Mitchell, and Mitchell gave him his key to the apartment. Mitchell then gathered his belongings and, according to Haynes, left the apartment "calm[ly] and quietly" in his black Infinity vehicle.

¶7. Later that evening, Haynes was at her apartment with four guests, including two of her cousins, Dawanna Johnson and Cordarryl Curtis. Around 9:00 p.m., Dawanna and Cordarryl stepped outside the apartment; Dawanna needed to take a phone call, and Cordarryl wanted to smoke. They were right outside the apartment and just a couple steps down from the apartment door. Haynes testified that she then heard gunshots, but she did not see what had happened because she was in the apartment.

¶8. After the gunshots stopped, Haynes heard Dawanna calling her name, so she went to the front door of the apartment and saw Dawanna lying under the stairs. Haynes went outside to check on Dawanna, who was conscious but not moving. Haynes testified that she asked Dawanna who shot her, and Dawanna "told [her] Justin did it." After talking with Dawanna, Haynes went back inside the apartment, and the police and an ambulance arrived about that time. Haynes testified that she did not see Cordarryl when she went outside to check on Dawanna. She said that Cordarryl returned to the apartment after police began

3

arriving. Haynes testified that she did not see Dawanna or Cordarryl with a gun, nor did she see the other two people at her apartment that night with a gun.

¶9. Cordarryl and Dawanna testified at trial. Cordarryl testified that when he and Dawanna were outside, he heard a "pop," and because it was July, he first thought it was a firework. But he ducked anyway and then turned to look back. He testified, "And I see Justin Mitchell. He's coming. He coming past the staircase. And when I see him, he's rising up with the pistol that he had in his hand, like he was going to fire off a shot. And then that's when I started to turn away and run away." Once Cordarryl "made sure that [he] was safe and hidden," he called 911. Cordarryl testified that when he called the police, "I [told] them that . . . while me and my cousin were standing outside Justin Mitchell came, and he was shooting at us. And I ran away."

¶10. The recording of Cordarryl's 911 call to the police was played for the jury. On that call, Cordarryl said that someone "shot at me and my cousin." He then identified the shooter as "Justin Mitchell," the person whom his cousin (Haynes) had "put out of" her apartment earlier that day. Cordarryl told the dispatcher that he thought Mitchell was still at the scene. The dispatcher asked Cordarryl, "What was [the shooter] wearing?" Cordarryl responded, "A black hoodie, that's all I could see."

¶11. Dawanna testified that after she and Cordarryl stepped outside the apartment, she saw a figure "in her peripheral vision" approaching the area, wearing a dark jacket. Counsel for the State at trial asked Dawanna what she did once she saw the figure, as follows:

[COUNSEL]:        What do you do once you see that person?

4

| [DAWANNA]: | I stand, and I look to see what's going on because they've got their hands in the hoodie pocket part in the front. |
|---|---|
| [COUNSEL]: | And what happens at that point? |
| [DAWANNA]: | The figure proceeds to remove their hands out of the hoodie. I thought it was a phone until it was completely removed and saw that it was a gun. |
| [COUNSEL]: | What did you do at that point? |
| [DAWANNA]: | At that point, I'm frozen. He, then, aims at my male cousin and shoots. |
| [COUNSEL]: | Now, who's that male cousin again? |
| [DAWANNA]: | Cordarryl Curtis. |

When the figure passed through a lighted area, she was able to see the person was Mitchell.

¶12. After the first shot, Dawanna "[took] off running," with Cordarryl running ahead of her. Dawanna was hit by a bullet, causing her to trip and roll under the outside staircase. She testified that while she was on the ground, Mitchell walked over to her and continued to shoot, striking her on the outside of her knee, the inside of her knee, the top of her thigh, twice in her back, and once in her side. At that point, Dawanna "played dead." Mitchell eventually left the scene. Dawanna said she "blacked out." She said when she regained consciousness, the first responders were on the scene.

¶13. Deputy Payne, one of the first responders, testified that Dawanna told him Mitchell had shot her, and he passed the information along to his supervisor and the investigators

when they arrived.[2]  The police put out a BOLO[3] alert for Mitchell.

¶14.    Tunica County Sheriff's Office investigators who arrived at the scene that evening testified that they recovered seven 9mm shell casings, one projectile fragment, and two live rounds from the scene near Haynes's apartment.

¶15.    Forensic scientist Melissa DeBerry of the Mississippi Forensics Laboratory testified as a firearm and toolmark expert.  She testified that the recovered projectiles submitted for testing were "determined to be a .38 9-millimeter caliber . . . . Meaning we had weight, but we did not have diameter, so we couldn't accurately tell you if it was . . . exactly a 9-millimeter or if it was a .38.  But it fell within the .38 family."  DeBerry also testified that these seven spent shell casings had all been fired from the same gun.

¶16.    The day after the shooting, Mitchell went to the Tunica County Sheriff's Office on his own to report that his vehicle (a black Infiniti SUV) had been stolen.  But that vehicle was parked in the sheriff's office parking lot.[4]  When officers then recognized Mitchell as the suspect in the shooting, they arrested him.  Investigators attempted to speak with Mitchell, but he invoked his constitutional right to remain silent.

¶17.    After the State rested its case-in-chief, Mitchell moved for a directed verdict, which the trial court denied.  Mitchell elected not to testify.  The defense rested without presenting

---

[2] While in the ambulance, Dawanna also told one of the investigators that "Justin" had shot her.

[3] BOLO is an acronym for "be on the lookout."

[4] Investigator Bernadette Logan testified that she photographed the vehicle and ran the license plate number, which confirmed that the vehicle belonged to Mitchell.  The vehicle was searched.  No black hoodie or weapon was found in the vehicle.

any witnesses. After receiving instructions from the trial court and retiring for deliberations, the jury returned a verdict finding Mitchell guilty of aggravated assault (Count I) and attempted aggravated assault (Count II).

¶18. Mitchell filed a "Motion for Judgment of Acquittal Notwithstanding the Verdict, or in the Alternative, Motion for New Trial." In his post-trial motion, Mitchell asserted, among other issues, that the evidence was insufficient to support his convictions of either count; the guilty verdicts were against the overwhelming weight of the evidence; and the trial court erred in sustaining the State's objection to Mitchell's assertion of an alibi defense. The trial court denied Mitchell's post-trial motion. Mitchell appealed.

## DISCUSSION[5]

### I.   Sufficiency of the Evidence

¶19. Mitchell was convicted of attempted aggravated assault for "shooting at . . . Cordarryl Curtis." (Count II).[6] He asserts that the evidence was insufficient to support his conviction of Count II "because the evidence failed to establish beyond a reasonable doubt that Mitchell attempted to cause bodily injury to [Cordarryl]." We are not persuaded by Mitchell's contentions for the reasons addressed below.

¶20. "An appeal of the trial court's denial of a directed verdict or judgment notwithstanding the verdict is a challenge to the sufficiency of the evidence that is subject to a de novo standard of review." *Haymon v. State*, 346 So. 3d 875, 881 (¶14) (Miss. 2022).

---

[5] The standard of review applicable to each issue is discussed in context.

[6] Although raised in his post-trial motion, Mitchell does not challenge his conviction of Count I on appeal.

7

"In reviewing the sufficiency of the evidence, this Court views all evidence in the light most favorable to the State[.]" *Id.* Specifically, "[this Court] will reverse and render judgment in favor of the defendant only if the facts and inferences point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty . . . ." *Id.* (internal quotation marks omitted) (quoting *Young v. State*, 119 So. 3d 309, 315 (¶18) (Miss. 2013)). "The relevant inquiry is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Young*, 119 So. 3d at 315 (¶18) (internal quotation marks omitted).

¶21.   Mississippi Code Annotated section 97-3-7(2)(a) provides that "[a] person is guilty of aggravated assault if he . . . attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm[.]" Miss. Code Ann. § 97-3-7(2)(a)(ii) (Rev. 2020). "The crime of attempt consists of three elements: 1) an intent to commit a particular crime, 2) a direct ineffectual act done toward its commission, and 3) failure to consummate its commission." *Morris v. State*, 748 So. 2d 143, 146 (¶11) (Miss. 1999). Thus, to prove the attempted aggravated assault charge in this case, the State was required to present sufficient evidence that Mitchell acted with the intent to cause bodily injury to Cordarryl with a deadly weapon. *Id.*; *Jones v. State*, 378 So. 3d 440, 444 (¶15) (Miss. Ct. App. 2024).

¶22.   Considering the evidence in the light most favorable to the State, as we must, we find that sufficient evidence supports the conviction of attempted aggravated assault in Count II. Mitchell asserts that Cordarryl never saw the first shot, and thus he did not know whether

8

Mitchell was shooting at him. But whether Cordarryl saw the first shot does not end the analysis.

¶23. First, Dawanna specifically testified that she saw a figure, whom she later identified as Mitchell, shoot at Cordarryl. Dawanna testified that while she and Cordarryl were standing outside the apartment, she noticed a figure "in her peripheral vision" approaching the area. She stood watching the person, who, as Dawanna explained, "had their hands in the hoodie [front] pocket part." As she was watching,"[t]he figure . . . remove[d] their hands out of the hoodie . . . . [She thought the figure had] a phone until [the object] was completely removed and [she] saw that it was a gun." Continuing, Dawanna testified, "[A]t that point, I'm frozen. [The figure], then, aims at my male cousin [(Cordarryl)] and shoots." Later, during her redirect examination, Dawanna explained that seeing the figure "in her peripheral vision caused . . . [her] attention to be drawn to look up [from her phone,]" and this happened "prior to" the first shot. After the first shot, she saw that the person shooting was Mitchell.[7]

¶24. Second, although Cordarryl testified he initially thought that the first "pop" he heard

_____

[7] Mitchell asserts that Dawanna's testimony during her redirect examination "established that . . . she did not turn to look or actually see the shooter until after the first shot was fired." Mitchell's characterization of Dawanna's testimony is inaccurate. Although Dawanna testified that she did not *identify* the shooter as Mitchell until after the first shot, she also clearly testified during her redirect examination that she saw the figure "in [her] peripheral vision . . . *prior to* the first shot." (Emphasis added). During her direct examination, Dawanna testified that she watched that figure take aim and shoot at Cordarryl, and a short time later she identified the figure as Mitchell, who had passed through a lighted area. Mitchell also incorrectly asserts that at another point during her testimony, Dawanna said that she did not "turn to look at . . . the shooter until after the first shot." But Dawana was actually being questioned about what she saw *Cordarryl* doing "after the first shot." Dawanna responded, "After the first shot, I turned to look for my cousin, Cordarryl, and I saw him. And he was crouched down." This testimony has nothing to do with Dawanna's testimony about seeing and identifying *Mitchell*.

was a firework, he also testified that he ducked anyway—and then turned back to look. At that point, as Cordarryl testified, he saw Mitchell "coming past the staircase. And when I see him, he's rising up with the pistol that he had in his hand, like he was going to fire off a shot. And then that's when I started to turn away and run away." Consistent with Cordarryl's testimony, Dawanna testified that after the first shot, both she and Cordarryl started running, with Cordarryl running ahead of her. Mitchell continued to shoot, striking Dawanna in the buttocks. Although only Dawanna was struck by subsequent bullets, a jury could reasonably infer that the shots were fired at both Dawanna and Cordarryl, who were together running away from the gunfire.

¶25. Lastly, the jury also heard Cordarryl's 911 call to the police that he made that evening as soon as he felt that he was "safe and hidden." During that call, Cordarryl clearly told the dispatcher that someone "shot at me and my cousin." The dispatcher asked whether he knew the shooter's name, and Cordarryl responded, "Yes, Justin—Justin Mitchell."

¶26. At most, the points Mitchell raises with respect to his sufficiency-of-the-evidence assignment of error go to the weight of the evidence, not its sufficiency. "[T]he jury is the sole judge of the weight of the evidence and the credibility of the witnesses, and conflicts in the evidence are for the jury to resolve." *Boyd v. State*, 383 So. 3d 1280, 1290 (¶47) (Miss. Ct. App. 2024). Taking the evidence in the light most favorable to the State and accepting all reasonable inferences that can be drawn from that evidence, we find that the State presented sufficient evidence to allow a reasonable jury to find that the State proved the essential elements of attempted aggravated assault against Mitchell beyond a reasonable

10

doubt.

## II. Overwhelming Weight of the Evidence

¶27. Mitchell asserts, in the alternative, that the guilty verdict for attempted aggravated assault (Count II) was against the overwhelming weight of the evidence, and, therefore, the jury's guilty verdict on Count II should not stand. We find Mitchell's assertions unconvincing for the reasons addressed below.

¶28. "Our role as [an] appellate court is to review the trial court's decision to grant or deny a new trial for an abuse of discretion." *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017). "When reviewing a challenge to the weight of the evidence, this Court considers the evidence in the light most favorable to the verdict, and the State receives all favorable inferences that reasonably may be drawn from the evidence." *Young v. State*, 236 So. 3d 49, 55 (¶22) (Miss. 2017). "[The] Court will not order a new trial unless it is convinced that the verdict so contradicts the overwhelming weight of the evidence that to allow the verdict to stand would sanction an unconscionable injustice." *Id.* Upon review, we find that Mitchell's weight-of-the-evidence argument is unpersuasive for essentially the same reasons we have already addressed above.

¶29. The jury in this case heard and considered the witnesses' testimonies and the evidence presented and convicted Mitchell of attempted aggravated assault against Cordarryl. Like his assertions with respect to his sufficiency-of-the-evidence argument, Mitchell's weight-of-the-evidence argument turns on the fact that Cordarryl did not see Mitchell fire the first shot, and, *according to Mitchell*, Dawanna also did not see the first shot fired. But as we have

11

addressed above, Dawanna testified that the figure she saw and later identified as Mitchell pointed the gun at Cordarryl and fired it. Further, although Cordarryl did not see the first shot, his testimony and his 911 call to the police supported his claim that Mitchell shot at him *and* Dawanna.

¶30.   In any event, to the extent Mitchell asserts that there were inconsistencies in Cordarryl's or Dawanna's testimonies, we reiterate that it was the *jury's* role to determine "the weight and worth of witnesses' testimony" and resolve any conflicts in the evidence. *Jones v. State*, 252 So. 3d 574, 587 (¶54) (Miss. 2018). "It also [was] within the jury's province to draw reasonable inferences from facts based on experience and common sense." *Id.* With these principles in mind, and after viewing the evidence in the light most favorable to the jury's verdict on Count II, we cannot say that the verdict "so contradicts the overwhelming weight of the evidence that to allow [it] to stand would sanction an unconscionable injustice." *Young*, 236 So. 3d at 55 (¶22). We find that Mitchell's weight-of-the-evidence assertions are without merit.

### III.   Alibi Defense Evidence

¶31.   Mitchell asserts that the trial court erred in excluding his proposed alibi witness (his mother) and that he is therefore entitled to a new trial. The trial court's ruling was based on Mitchell's failure to comply with Mississippi Rule of Criminal Procedure 17.4. Citing the due process clauses[8] and the "compulsory process" clauses[9] of the federal and state

---

[8] U.S. Const. amend. XIV; Miss. Const. art. 3, § 14.

[9] U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor."); Miss. Const.

constitutions, Mitchell contends that by excluding his alibi witness, the trial court infringed upon his constitutional right to fully present a defense. For the reasons addressed below, we find Mitchell's contentions on this issue unpersuasive.

¶32. "The standard applied for appellate review of a trial court's sanction for discovery abuses is 'whether the trial court abused its discretion in its decision.'" *Lipsey v. State*, 50 So. 3d 341, 346 (¶12) (Miss. Ct. App. 2010) (quoting *Gray v. State*, 799 So. 2d 53, 60 (¶26) (Miss. 2001)). In exercising its discretion, the trial court "must also insure the constitutional right of the accused to present a full defense in his or her case." *Ross v. State*, 954 So. 2d 968, 996 (¶56) (Miss. 2007). But an accused's "*right to present relevant testimony is not without limitation. The right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal justice process*." *Coleman v. State*, 749 So. 2d 1003, 1008 (¶11) (Miss. 1999).

¶33. Rule 17.4 provides:

(a) Alibi Defense

(*1*) *In General.* Upon the written demand of the prosecuting attorney stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten (10) days, or at such other time as the court may direct, upon the prosecuting attorney, a written notice of the intention to offer a defense of alibi, which notice shall state the specific place(s) at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom the defendant intends to rely to establish such alibi.

MRCrP 17.4(a)(1). Pursuant to Rule 17.4(a)(2), if either party fails to comply with Rule 17.4(a)(1), "the court may use such sanctions as it deems proper, including . . . [e]xcluding

art. 3, § 26.

13

the testimony of the undisclosed witness." MRCrP 17.4(a)(2).

¶34.   In *Coleman*, the supreme court affirmed the trial court's ruling excluding the defendant's alibi witness "based upon the defense's failure to comply with [the notice requirements of Rule 17.4]."[10] *Coleman*, 749 So. 2d at 1006 (¶7).  The State gave the defense a written demand for alibi witnesses on April 13, 1995. *Id.* at (¶8).  Over two years later and just a week before trial, the defendant told his lawyer that he wanted to call his former girlfriend, Jones, to the stand as an alibi witness. *Id.* at (¶5).  The defense notified the State that Jones would be called as an alibi witness, but the notice did not contain her address or the substantive detail of the place where the defendant claimed to be at the time of the crime. *Id.*  Jones was located the night before the last day of trial and appeared at trial, but the trial court excluded her as a witness due to the defense's failure to comply with the rule's notice requirements. *Id.*  The supreme court's analysis concerning the exclusion of an alibi witness as a sanction for noncompliance with the former rule (now Rule 17.4) is instructive in this case.

¶35.   In concluding that the trial court's ruling excluding the defendant's alibi witness was "entirely consistent" with both the notice-of-alibi rule and the defendant's rights under the federal and state constitutions, the supreme court began its analysis by observing that "[o]ne of the fundamental policies of our criminal procedural rules is the avoidance of unfair surprise to either the prosecution or the defense." *Id.* at 1008 (¶13).  With respect to the

---

[10] When *Coleman* was decided, the alibi notice requirements were set forth in Rule 9.05 of the Uniform Rules of Circuit and County Court Practice. *Coleman*, 749 So. 2d at 1006 (¶7).  Rule 17.4 is based on former Uniform Rule 9.05. *See* MRCrP 17.4 cmt.

14

notice-of-alibi rule, in particular, the supreme court observed, "The function of [this rule] . . . is to afford the prosecution advance notice that the defendant may claim an alibi and that, if he does, his evidence will be thus and such." *Id.* The supreme court explained, "In this way the prosecution is afforded a reasonable opportunity to investigate the alibi and to prepare rebuttal evidence for trial if the alibi is in fact asserted." *Id.* Further, the notice-of-alibi rule also "prevents both trial by ambush and a waste of valuable resources of the State in the investigation of matters that might never be advanced at trial." *Houston v. State*, 752 So. 2d 1044, 1046 (¶9) (Miss. Ct. App. 1999).

¶36. Thus, in light of the considerations specific to the need for notice of an alibi defense, the supreme court has authorized exclusion as a sanction under two scenarios:

> [1] Where a trial court finds that an alibi discovery violation is willful and motivated by a desire to obtain a tactical advantage, *or* [2] where the facts indicate that the defendant intentionally failed to co-operate with his own counsel to the extent of indicating a willful disdain for the adversarial system that would minimize the effectiveness of cross-examination and the adversary process.

*Coleman*, 749 So. 2d at 1010 (¶19) (emphasis added).

¶37. Upon review, and in light of these principles, we find no abuse of discretion in the trial court's ruling excluding Mitchell's proposed alibi witness in this case.

¶38. The record shows that the State filed a demand for notice of an alibi defense on April 18, 2022. The demand provided in relevant part as follows:

> [T]he State of Mississippi, alleging that the offense in this Cause occurred on or about July 22, 2021, does hereby demand:

> 1) that the Defendant disclose if he or she intends to rely on an alibi defense,

15

2) and if so, the specific place or places at which the Defendant claims to have been at the time of the alleged offense,

3) as well as the names and addresses upon which the Defendant intends to rely to establish such alibi.

¶39.    Mitchell served a notice of alibi defense nearly a year later, on April 7, 2023—the Good Friday before trial was to begin on Easter Monday, April 10.  The notice provided that the defense would call Mitchell's mother to the witness stand, who would testify that on the night of the shooting, Mitchell was at her house in Memphis "[s]hortly before dark, and after she had left work, and he remained at [her] house until [she] left for work the following morning.  Further, she will testify that he did leave the house once she arrived at her house on July 22, 2021."  The notice provided the witness's name, address, and telephone number.  The State objected due to the notice's untimely service.

¶40.    The trial court held a hearing regarding the alibi issue on the Monday morning of trial.  At the hearing, Mitchell's counsel made one argument:  that the State was not prejudiced "by said late notice" because "[the defense] provided the name, address, and telephone number [in the notice]."

¶41.    In response, the State argued that Mitchell should have known when he was charged whether he had an alibi and that the notice given by the defense was untimely under Rule 17.4(a)(1).  The State further pointed out that it had furnished all its discovery on April 18, 2022, and had served its demand for notice of an alibi defense on that same date.  In contrast, Mitchell did not serve his notice until the Friday before the Monday trial, which also was Good Friday, a county holiday.  Due to the holiday, most of the investigators had that day off

16

work and were unavailable to investigate the alibi claim. In short, the State argued that because of the late alibi disclosure, the State was unable to address the evidence and the State contended that to allow the witness to testify would "certainly be trial by ambush on the State."

¶42. The trial court granted the State's motion to exclude the alibi witness, pointing out that "[R]ule 17.4 does say the defendant shall serve within ten days after the demand the alibi, and . . . [w]e're about eleven months past that." Continuing, the trial court found that "to file it on Good Friday, when the Courthouse is not even open is way too late. It [would] be different if it was filed a little late, and we were still several months out from trial. But I'm not letting it in." Citing Rule 17.4(a)(2)(D),[11] the trial court excluded the alibi witness, as follows:

> I mean, this is his mother. It's not like this is a surprise witness that he just discovered, "Oh, somebody saw me, and I just discovered over the weekend that this person saw me getting gas somewhere in another state." This is his mother, and he's known this—he's had this information the whole time. So it's too late, and it's not coming in.

¶43. On appeal, Mitchell first asserts that the trial court's ruling was in error because the State's demand for notice of an alibi defense was defective. In particular, the State's alibi demand only specified the date of the offense, but it did not specify the time or place of the offense, as required by Rule 17.4(a)(1). Mitchell, however, failed to raise this issue in the trial court. It is therefore waived on appeal. *Adams v. State*, 217 So. 3d 693, 697 (¶10) (Miss. Ct. App. 2016) (holding that defendant's "contention was not raised before the trial

---

[11] Rule 17.4(a)(2)(D) allows the court to "[e]xclud[e] the testimony of the undisclosed witness" when any party fails to comply with Rule 17.4(a)(1). MRCrP 17.4(a)(2)(D).

court and is procedurally barred on appeal").[12]

¶44. Mitchell also asserts that the trial court erred by excluding his alibi witness without finding that his "belated disclosure was willful or motivated to obtain a tactical advantage." But this is an incomplete statement of the applicable law. As set forth above, the supreme court has authorized exclusion as a sanction under *two* scenarios—the scenario Mitchell describes, *or* the scenario "where the facts indicate that the defendant intentionally failed to co-operate with his own counsel . . . indicating a willful disdain for the adversarial system that would minimize the effectiveness of cross-examination and the adversary process." *Coleman*, 749 So. 2d at 1010 (¶19).

¶45. We find that the second scenario applies here and that the trial court did not abuse its discretion in excluding Mitchell's alibi witness—his mother—under the circumstances in this case. This Court's decision in *Lipsey* supports our conclusion on this issue. *See Lipsey*, 50 So. 3d at 348 (¶¶17-18).

¶46. In *Lipsey*, this Court recognized that the trial court did not make a specific finding about whether the defendant or defense counsel willfully violated the alibi notice requirement. *Id.* at (¶17). Nevertheless, we found "sufficient facts in the record to indicate that while [the defendant's] counsel was forthcoming about the new alibi information, [the defendant] himself was not." *Id.*

_____

[12] Mitchell also asserts that Rule 17.4 "is a procedural rule[,] . . . [a]nd, in criminal cases, procedural and evidentiary rules do not trump a defendant's constitutional rights." But as discussed, the supreme court has found that the exclusion of an alibi witness as a sanction is "entirely consistent" with Rule 17.4 *and* a defendant's constitutional rights under the two scenarios set forth above. *Coleman*, 749 So. 2d at 1010 (¶19).

18

¶47. Similar to the circumstances in the case before us, we found in *Lipsey* that "[the defendant's] timing is suspect; he had over one year to inform his counsel about the alibi witness and decided, on the Labor Day holiday and the day before trial commenced, to do so." *Id.* Because "[t]he testimony of this surprise alibi witness would have disrupted the adversary process and flaunted the public interest in the fair and efficient administration of justice[,]" *id.* (quoting *Coleman*, 749 So. 2d at 1010 (¶19)), we found "no violation of [the defendant's] Sixth Amendment right to compulsory process" in excluding the defendant's alibi witness. *Id.* Additionally, we found that the defendant's failure to timely and properly notify the State of his alibi defense pursuant to Rule 9.05 (now Rule 17.4) further supported the Court's conclusion. *Id.* at (¶18).

¶48. The same reasons discussed in *Lipsey* also apply here. As the prosecutor pointed out at the hearing on this issue, "[g]iven this [incident] occurred back in July of 2021, certainly by the time that [the defendant] was arraigned,[13] he knew certainly, 'I wasn't there. I could not have committed it.'" At that point—over a year before the April 10, 2023 trial—Mitchell should have been forthcoming with his counsel concerning any alibi information he had. Further, as the trial court found, "this [alibi witness] is [the defendant's] mother. It's not like this is a surprise witness that he just discovered . . . . This is his mother, and he's known this—he's had this information the whole time." Mitchell failed to timely notify the State of his alibi defense pursuant to Rule 17.4. As in *Lipsey*, to allow Mitchell's mother to testify under the circumstances here "would have disrupted the adversary process and flaunted the

---

[13] Mitchell waived formal arraignment and entered a plea of not guilty to both charges on February 15, 2022.

19

public interest in the fair and efficient administration of justice." *Id.* at (¶17) (quoting *Coleman*, 749 So. 2d at 1010 (¶19)). Accordingly, we find no error or abuse of discretion in the trial court's ruling excluding Mitchell's alibi witness.

¶49. For the reasons stated, we find Mitchell's assignments of error without merit and affirm Mitchell's convictions and sentences.

¶50. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR.**