# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00412-COA

**MARSHON CORTEZ DIMING A/K/A BIG SHORTY A/K/A MARSHON DIMING**                     **APPELLANT**

v.

**STATE OF MISSISSIPPI**                                                                                      **APPELLEE**

DATE OF JUDGMENT:               03/11/2022
TRIAL JUDGE:                       HON. GERALD W. CHATHAM SR.
COURT FROM WHICH APPEALED:  DESOTO COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:     OFFICE OF STATE PUBLIC DEFENDER
                                   BY: GEORGE T. HOLMES
                                   MARSHON CORTEZ DIMING (PRO SE)
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                                   BY: CASEY BONNER FARMER
DISTRICT ATTORNEY:             JOHN CHAMPION
NATURE OF THE CASE:           CRIMINAL - FELONY
DISPOSITION:                       AFFIRMED - 10/24/2023
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., GREENLEE AND McDONALD, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.    A DeSoto County grand jury indicted Marshon Cortez Diming (Diming), along with Jamoni Diming (Jamoni) and James Jakes, on one count of conspiracy to commit armed robbery, one count of capital murder for the death of Serena Madkins, one count of capital murder for the death of Antonio Gipson, one count of attempted murder of Artavis Pimpton, and one count of attempted murder of A.G., a minor. Diming was tried separately. Following trial, a jury found Diming guilty as charged on Counts 1 through 4.[1] The trial

---

[1] A docket entry dated February 22, 2022, shows that the trial court entered an order remanding Count 5, the attempted murder of A.G., a minor.

court sentenced Diming to two terms of life imprisonment without eligibility for parole for the capital murder convictions, five years for the conspiracy conviction, and twenty years for the attempted murder conviction, with all the sentences ordered to be served consecutively in the custody of the Mississippi Department of Corrections (MDOC).

¶2.     Diming filed a direct appeal through counsel and was subsequently granted leave by this Court to file a pro se appellant's brief in which he asserted five additional assignments of error.  Combined, the issues Diming raises on appeal are as follows:  (1) the verdicts were contrary to the weight of the evidence, and, therefore, a new trial is warranted on all counts; (2) his indictment was defective because it alleged armed robbery as the underlying felony for capital murder; (3) his indictment subjected him to double jeopardy; (4) the State violated certain rules of discovery under *Brady*[2] and *Giglio*,[3] requiring a new trial; (5) his indictment was constructively amended by certain jury instructions; and (6) his counsel was ineffective for failing to bring his post-trial motion for a hearing.  We find that the jury's verdicts are supported by the weight of the evidence and that Diming's additional assignments of error are unpersuasive or without merit.  Accordingly, we affirm Diming's convictions and sentences.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

¶3.     As noted, Diming, Jamoni, and Jakes were indicted on five counts, as follows:  Count

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

[3] *Giglio v. United States*, 405 U.S. 150 (1972).

1—conspiracy to commit armed robbery; Count 2—capital murder for the death of Serena Madkins; Count 3—capital murder for the death of Antonio Gipson; Count 4—attempted murder of Artavis Pimpton; and Count 5—attempted murder of A.G., a minor. Diming was tried separately from February 22 through 24, 2022. The jury convicted Diming of Counts 1-4, and the trial court sentenced him as set forth above.[4]

¶4. At trial, Pimpton testified for the State. He had been staying in Horn Lake at Antonio Gipson's apartment for about ten days, sleeping on the couch. Gipson's girlfriend, Madkins, also lived at the apartment with her baby.

¶5. On the day of the murders, May 30, 2019, Pimpton and Gipson got off work about 3:00 or 4:00 p.m., went to another friend's home for a while, and then "went riding around" and got something to eat. Pimpton and Gipson had been smoking marijuana after getting off work. That evening, Pimpton and Gipson went to Gipson's apartment to watch a basketball game and drink beer. Madkins was in the "master bedroom" with the baby.

¶6. During halftime, Gipson went to the bathroom, and Pimpton heard a knock on the door. Pimpton opened the door. Jamoni (the defendant's brother) was standing outside. Pimpton testified that he had known Jamoni for a long time because they were both from the same town—Webb, Mississippi. Pimpton said Jamoni had something tied around his face, but he could see who it was because the part of Jamoni's face between his eyebrows and below his mouth was uncovered. Jamoni appeared to be alone.

---

[4] Certain pretrial matters are discussed in context below.

3

¶7.    Pimpton said that Jamoni came inside, walked toward the couch, and picked up Pimpton's 9-millimeter handgun, which was on the couch.[5] The gun was loaded. Jamoni asked where "Little Tony" was, which is a nickname for Gipson. Jamoni then turned around as if he were going to the door. At that point, two other men—Diming (the defendant) and Jakes—came through the open door. Both were armed with handguns. Pimpton testified that Diming and Jakes also "had something on their face," but he could see their features. Pimpton knew Diming; like his brother, Diming was from Webb, Mississippi. Pimpton later learned that the other person was Jakes.

¶8.    Diming, with the gun in hand, told Pimpton to give him his (Pimpton's) money, saying, "Give it up, South, give it up." Pimpton gave Diming four to five hundred dollars that he had on him. Pimpton recognized Diming by sight when Diming came into the apartment. Pimpton also testified that he recognized Diming's voice when Diming demanded Pimpton's money. Additionally, Diming called him "South," which is what some people from Webb call Pimpton.

¶9.    After Pimpton gave Diming the money, the men forced everyone into the master bedroom. Madkins and Gipson were on the bed, and Pimpton said he was lying on the floor face down with his head and upper torso in the bathroom and his legs in the bedroom. He

---

[5] Pimpton testified that Jamoni "came in and sat down and got my gun like he was going to sit down and got my gun off the couch." Pimpton then said that Jamoni "came in and acted like he was going to sit down. He didn't sit down. He just grabbed my gun and turned around."

4

could not see everything that was happening, but he could hear what was going on. Pimpton heard the men still asking for money. Gipson told the men that the money was outside. Jamoni left the room, got the money, and came back in.

¶10. Pimpton testified that when Jamoni got back, somebody said "kill everybody." He heard Gipson say, "Big Shorty, don't do it . . . you ain't got to do that, Big Shorty." Pimpton said that Diming went by the nickname "Big Shorty." After that, guns started firing. Pimpton testified that all three men had guns. He was not sure, but he thought he heard "[a]bout nine or ten" shots. He was struck twice, once in the lower back and once on the wrist. Pimpton "played dead," and the men ran from the apartment. He did not see who was shooting.

¶11. Pimpton continued lying on the floor for about five minutes after he thought the men left the apartment because he was not sure if they were still there. He then he got up and got his phone. He called 911. The dispatcher tried to get him to go outside, but he was afraid the men were still there. He did not know the address of the apartment but told the dispatcher that the apartment was "behind Popeye's." Pimpton said he paced throughout the house, looking through a window in the other bedroom to see if he could see the police drive up. Once he saw police cars pull up, he went outside to flag them down.

¶12. Pimpton was taken to the hospital by ambulance. Before he was taken away, he talked to the police at the scene. Pimpton testified that at that time, he did not tell the officers the name of anyone who was involved because "I was in shock. I was scared and I didn't know

5

what to do." When a detective came to the hospital to interview him, however, Pimpton told the detective that Jamoni and Diming were involved. When he was discharged from the hospital, Pimpton went to the police station to identify the third shooter. Pimpton identified Jakes by looking at Jamoni's Facebook page.

¶13. The responding Horn Lake police officers found Pimpton outside the apartment on the ground with two gunshot wounds. Officer Shane Griffin testified that when he found Pimpton outside the apartment complex, Pimpton was "obviously wounded" and "in a state of shock." He said that Pimpton did not make a lot of sense and was "obviously scared." Other responding officers confirmed Pimpton's "distressed" state when they found him. Officers also testified that they found a blood trail in the parking lot and near Pimpton's car and another car (Gipson's truck). Pimpton told them that before they arrived, he had taken clothes from Gipson's truck and put them in his car.

¶14. The officers testified that Pimpton directed them inside, where they found the bodies of Gipson and Madkins in a bedroom. Both Gipson and Madkins were dead. They had died from multiple gunshot wounds. The baby was unharmed. Photos of the crime scene were admitted into evidence and presented to the jury. Officer Griffin testified that the apartment appeared to be in disarray. Photos show some blood in the kitchen and near the garbage can, and the garbage can was empty. A loaded .357-caliber handgun was found in the apartment along with a magazine for an assault-style rifle.

¶15. Detective Benjamin Swan testified that officers recovered ten .9-millimeter shell

6

casings from the master bedroom and bathroom. A projectile fragment was found in a kitchen drawer; Detective Swan testified that the fragment had passed through the wall and came to rest in the kitchen. Detective Swan also testified that the police obtained phone records from Jamoni's and Jakes's phones. These phone records showed that Jamoni and Jakes were in frequent communication the night of the murders, other than a ten to twelve-minute break between 9:20 p.m. and 9:32 p.m. Another officer testified that the 911 call came through around 9:27 p.m. No phone records from a phone belonging to Diming were offered as evidence. Detective Swan testified that none of the phone records from Jamoni's and Jakes's phones showed that Diming was with the other two men.

¶16. Madkins's friend Jasmine Smith testified that she was with Madkins at the apartment on the night of the murders. She confirmed that Pimpton and Gipson were drinking beer and watching a basketball game. Smith testified that she left around 9:15 or 9:20 p.m. and that she saw no one else at the apartment that night.

¶17. At the close of the State's case-in-chief, defense counsel moved for a directed verdict, which the trial court denied.

¶18. Diming did not testify, nor did the defense call any witnesses. The trial court denied the defense's renewed motion for a directed verdict.

¶19. The jury convicted Diming of one count of conspiracy to commit armed robbery, two counts of capital murder, and one count of attempted murder. The trial court sentenced Diming as set forth above.

¶20. Diming filed a "Motion for New Trial and/or JNOV" on March 14, 2022. The motion was not set for hearing. The trial court denied Diming's motion. The trial court first noted that Diming abandoned his motion, "having failed to bring the matter before the Court within a reasonable time for hearing," but the court then nevertheless found "that the verdict [was] supported by substantial evidence presented at trial" and that Diming had "failed to establish that he [was] entitled to a new trial."

¶21. Diming appealed and filed an appellant's brief through counsel. The State responded, and Diming's appellate counsel did not file a reply brief. After the case was submitted for consideration, Diming moved for leave to file a pro se supplemental brief, which this Court granted under Mississippi Rule of Appellate Procedure 28(b). We turn now to address the six assignments of error raised in Diming's combined appellate briefing.

**STANDARD OF REVIEW**

¶22. "Our role as [an] appellate court is to review the trial court's decision to grant or deny a new trial for an abuse of discretion." *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017). "When reviewing a challenge to the weight of the evidence, this Court considers the evidence in the light most favorable to the verdict, and the State receives all favorable inferences that reasonably may be drawn from the evidence." *Young v. State*, 236 So. 3d 49, 55 (¶22) (Miss. 2017). In this regard, "[the] Court will not order a new trial unless it is convinced that the verdict so contradicts the overwhelming weight of the evidence that to allow the verdict to stand would sanction an unconscionable injustice." *Id.* Additional

8

standards of review will be addressed in context below.

## DISCUSSION

### I.     Weight of the Evidence

¶23.    Diming asserts that the verdicts against him for conspiracy to commit armed robbery, two counts of capital murder, and one count of attempted murder were contrary to the weight of the evidence.  In particular, Diming asserts that the State's only evidence against him was Pimpton's testimony, and his testimony was so "inconsistent," "unreliable," and "unworthy of belief" that reversal and a new trial on all counts is warranted.  We disagree.  For the reasons addressed below, we affirm Diming's convictions and sentences.

¶24.    We begin by reviewing the elements of the crimes at issue.  Mississippi Code Annotated section 97-1-1 (Rev. 2014) "makes it a crime 'if two or more people conspire . . . to commit a crime . . . .'" *Johnson v. State*, 792 So. 2d 253, 258 (¶17) (Miss. 2001) (quoting Miss. Code Ann. 97-1-1).[6]  The "crime" in this case was armed robbery, defined as the "felonious[] tak[ing] or attempt to take from the person . . . the personal property of another

_____

[6] The conspiracy instruction given to the jury at trial provided, in relevant part, as follows:

> A conspiracy is an agreement or understanding between two or more people to commit a crime.  In establishing a conspiracy, the State is never required to prove, in express terms, an agreement between the parties to commit the crime; it is sufficient when the evidence proves beyond a reasonable doubt, from all of the facts and circumstances together with the acts of the parties, a common design or understood purpose between the parties to commit the crime.

and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon." Miss. Code Ann. § 97-3-79 (Rev. 2014). With respect to the deaths of Gipson and Madkins, "[c]apital murder" includes "[t]he killing of a human being without the authority of law . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery . . . or in any attempt to commit such felon[y]." Miss. Code Ann. § 97-3-19(2)(e) (Supp. 2017). Regarding Diming's attempted murder conviction, Mississippi Code Annotated section 97-1-7(2) (Rev. 2014) provides that "[e]very person who shall design and endeavor to commit an act which, if accomplished, would constitute an offense of murder under Section 97-3-19, but shall fail therein, or shall be prevented from committing the same, shall be guilty of attempted murder." The jury was instructed on each of these crimes.

¶25. With the elements of these crimes in mind, we find it relevant that Pimpton's testimony was not inconsistent on the following material facts: Jamoni knocked on the door, Pimpton opened the door, and Jamoni entered and grabbed the gun sitting on the couch. Diming and Jakes then came through the open door, joining Jamoni. Both Diming and Jakes were armed. Diming, with a gun in hand, told Pimpton to hand over his money. Pimpton did so. The men then forced Pimpton and Gipson into the master bedroom with Madkins. The men continued to demand money and then began shooting once the men got the money. The three men then left. Madkins and Gibson died, and Pimpton was shot in the back and wrist. We find that the inconsistencies that Diming relies on to discredit Pimpton's testimony do

10

not change these material facts.

¶26.    For example, Diming points to Pimpton's testimony that "Jamoni sat down" on the couch, while Pimpton's other testimony suggested that Jamoni did not sit down but, instead, immediately reached for the gun that was on the couch next to Pimpton.  Diming argues that if the three men conspired to commit a robbery, Jamoni would not have entered the apartment without a weapon.  But whatever inconsistencies existed in Pimpton's testimony "belonged to the jury to weigh and consider."  *Young*, 236 So. 3d at 57 (¶40).  In this case, the jury heard this testimony and still convicted Diming.  The supreme court and this Court have consistently recognized that "the jury is the sole judge of the weight and worth of witnesses' testimony," *Jones v. State*, 252 So. 3d 574, 587 (¶54) (Miss. 2018), "and is free to accept or reject all or some of the testimony given by each witness."  *Young*, 236 So. 3d at 57 (¶35); *accord Magee v. State*, 349 So. 3d 734, 750 (¶43) (Miss. Ct. App. 2022), *cert. denied sub nom*. *Haynes v. State*, 348 So. 3d 332 (Miss. 2022).  We will not disregard these fundamental concepts.  Accordingly, we find that these perceived inconsistencies are wholly insufficient to warrant the reversal of Diming's convictions and a new trial.

¶27.    Diming also asserts that Pimpton's testimony was inconsistent concerning the facial coverings that the intruders wore.  But we find it relevant that although Pimpton testified that the men had something on their faces, he consistently testified that their faces were showing enough so that he could identify them.  Pimpton also testified that he could identify Diming because he knew Diming's voice, and Diming called him "South," a nickname some people

11

from Webb called Pimpton. Pimpton also heard Gipson call out before the shooting started, "Big Shorty, don't do it . . . you ain't got to do that, Big Shorty." Pimpton testified that Diming went by the nickname "Big Shorty."

¶28. Diming further suggests that "it is obvious that Pimpton and Gipson were involved in illegal activity" on the night of the murders because Pimpton did not explain why he had a loaded gun next to him on the couch, why narcotics were found in Gipson's truck in the parking lot, and why another firearm was found in the house. According to Diming, the "self-serving" and "unreliable" nature of Pimpton's testimony is therefore "apparent."[7] Diming does not explain, however, how any purported illegal activity by Pimpton and Gipson diminishes the reliability of Pimpton's testimony that Diming, Jamoni, and Jakes robbed and shot Pimpton, Gipson, and Madkins. In any event, the record reflects that although all the officers who encountered Pimpton that night agreed that he was distressed and in shock, no officer testified that Pimpton's behavior was abnormal or suspicious. The jury heard and weighed all the evidence before it and determined that Diming was guilty as charged.

---

[7] Diming also describes purported inconsistencies in Pimpton's testimony concerning when he left the apartment. But any inconsistencies are inconsequential. Pimpton explained that he waited to leave the apartment until after he believed the men had left because he was afraid to leave any sooner. He kept a lookout from an apartment window and went outside when he saw the patrol cars. Detective Swan testified that Pimpton told the officers he had gone to Gipson's truck to take some clothes from the truck and put them in his car in this same time frame. Given Pimpton's state of "shock" and "distress," we find that nothing about this testimony is "so implausible . . . as to be unworthy of belief" that would allow this Court to disturb the jury's verdicts in this case. *Brown v. State*, 764 So. 2d 463, 467 (¶9) (Miss. Ct. App. 2000).

¶29. "A jury's resolution of factual determinations must be respected where, after reviewing all the evidence in the light most consistent with the jury's finding, the Court concludes that sufficient evidence supported the finding." *Jones*, 252 So. 3d at 588 (¶57). We find that this principle applies here and that Diming's arguments attacking Pimpton's credibility do not meet the high standard necessary for reversal. Indeed, "[u]nless testimony necessary to support the jury's verdict is so implausible or so substantially impeached as to be unworthy of belief, the jury's decisions in such matters is beyond the authority of a reviewing court to disturb." *Brown*, 764 So. 2d at 467 (¶9). A new trial is warranted only if the verdicts "so contradict[] the overwhelming weight of the evidence that to allow the verdict[s] to stand would sanction an unconscionable injustice." *Young*, 236 So. 3d at 55 (¶22). This scenario is not present here. For the reasons addressed above regarding this issue, we affirm Diming's convictions and sentences.

## II.    Armed Robbery as Underlying Felony for Capital Murder

¶30. Diming was indicted on two counts of capital murder for the deaths of Madkins and Gipson, which occurred during an armed robbery. Diming asserts that his indictment was defective because "armed robbery" is not a listed offense in section 97-3-19(2)(e), which defines capital murder as follows:

(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
. . . .

(e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson,

13

*robbery*, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or in any attempt to commit such felonies[.]

Miss. Code Ann. § 97-3-19(2)(e) (emphasis added).

¶31. To begin, the record reflects that Diming did not make this defective-indictment argument to the trial court. It is therefore procedurally barred. *Johnson v. State*, 290 So. 3d 1232, 1238 (¶26) (Miss. 2020) ("A variance [in an indictment] not objected to at trial is waived.").

¶32. Despite this procedural bar, we reviewed this argument and find that it is without merit. As set forth above, a murder during a "robbery" is a capital murder. Miss. Code Ann. § 97-3-19(2)(e). Diming asserts, however, that "armed robbery" is not "simple robbery" and that because they are "very different and distinctive crimes," armed robbery does not fit within the definition of capital murder.

¶33. We are not persuaded by this argument. As addressed in Part I above, section 97-3-79 defines armed robbery and provides that a person who "take[s] or attempt[s] to take from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of *robbery* . . . ." (Emphasis added). The only difference between "simple robbery,"[8] as referenced by Diming, and "armed robbery," is the

---

[8] Mississippi Code Annotated section 97-3-73 (Rev. 2020) defines "robbery" as follows: "Every person who shall feloniously take the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such

14

"exhibition of a deadly weapon." *Compare* Miss. Code Ann. § 97-3-73 *with* Miss. Code Ann. § 97-3-79. This distinction does not eliminate "armed robbery" as a "robbery" within the plain meaning of the capital murder statute (section 97-3-19(2)(e)). Indeed, simple robbery is a lesser-included offense of armed robbery. *Fulcher v. State*, 805 So. 2d 556, 560 (¶11) (Miss. Ct. App. 2001) (recognizing that "simple robbery is a lesser-included offense of armed robbery"); *see Wallace v. State*, 10 So. 3d 913, 917 (¶10) (Miss. 2009) (recognizing that "[a] lesser-included offense . . . is one in which all the essential ingredients are contained in the offense for which the accused is indicted" (emphasis omitted)). In short, because armed robbery is robbery, it is an underlying felony to capital murder, and Diming's indictment was not defective. We find that this assignment of error is without merit.

### III.   Double Jeopardy

¶34.   Diming asserts that his indictment was defective because it "violated double jeopardy,"[9] basing this assertion on what appears to be two reasons. We address these arguments below but again begin by observing that these arguments are waived because Diming raises them for the first time on appeal. *Johnson*, 290 So. 3d at 1238 (¶26).

person in fear of some immediate injury to his person, shall be guilty of robbery."

[9] The prohibition against double jeopardy is found in the Fifth Amendment to the United States Constitution and Article III, Section 22 of the Mississippi Constitution, both prohibiting multiple convictions for "the same offense." *See Lee v. State*, 469 So. 2d 1225, 1228 (Miss. 1985) ("Each of th[e]se provisions guarantees to each citizen that he shall not twice be placed in jeopardy for the same offense. We construe the double jeopardy clause of our Constitution consistent with authoritative constructions of the Constitution of the United States."); *Benton v. Maryland*, 395 U.S. 784, 795-96 (1969) (incorporating Fifth Amendment protection from double jeopardy to apply against the states).

Procedural bar aside, we also find that the double jeopardy arguments Diming raises are without merit.

¶35. Regarding his first argument, Diming claims that the indictment subjected him to double jeopardy because "the only differences" in Count 2 and Count 3 were the names of the murder victims. We have rejected this same argument in at least two cases, finding that the defendant "was not being punished twice for the 'same' offense because there was 'a different element in each offense'—a different victim." *Reynolds v. State*, 227 So. 3d 428, 438 (¶39) (Miss. Ct. App. 2017) (quoting *Towner v. State*, 812 So. 2d 1109, 1114 (¶22) (Miss. Ct. App. 2002)). The same reasoning applies here. Diming was not punished twice for the same offense because there was a different element in each count: the victim. *Id.*; *see also Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975) (When "each [separately charged crime] requires proof of a fact that the other does not, the *Blockburger*[10] test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.").

¶36. Diming also appears to assert that his indictment is defective and could cause him to experience double jeopardy because the victim of the armed robbery (the underlying crime for the capital murder) was not named in the indictment. Although this argument was at one time recognized as viable by the supreme court, *Rowland v. State*, 98 So. 3d 1032, 1039 (¶12)

---

[10] *Blockburger v. United States*, 284 U.S. 299, 304 (1932), requires that courts examine the separately charged offenses to determine "whether each provision requires proof of a fact which the other does not."

(Miss. 2012),[11] this holding was overruled when the supreme court subsequently held that the victim of an underlying robbery is *not* an element of capital murder that must be stated in an indictment. *Carson v. State*, 212 So. 3d 22, 33-34 (¶¶38-41) (Miss. 2016), *overruling Rowland*, 98 So. 3d at 1039 (¶12).

¶37.    As the supreme court recognized, because "[t]he *Blockburger* test does not look to the facts adduced at trial but rather focuses on the elements of the offense charged," and the identity of the victim of the underlying felony is not an element of capital murder, then the lack of identity in the indictment does not trigger a double jeopardy analysis. *Id.* at 33 (¶39) (citing *Culp v. State*, 933 So. 2d 264, 281 (¶58) (Miss. 2005)). For these reasons, we find that this assignment of error fails.

###    IV.    Alleged Discovery Violations

¶38.    Diming asserts that the State "conducted interviews of material witnesses Jamoni Diming and James Jakes" but "failed to make any effort to preserve or disclose the statements to defense counsel." These witnesses did not testify, and no evidence from them was presented at trial. Nevertheless, Diming appears to assert he is entitled to a new trial because he has "a Constitutional right to know what was said about him." For the reasons addressed below, we are not persuaded by Diming's assertions.

¶39.    "Trial courts have considerable discretion in discovery matters, and their decisions

---

[11] *Rowland* was overruled on other grounds by *Howell v. State*, 358 So. 3d 613, 615-16 (¶¶8, 12) (Miss. 2023).

17

will not be overturned unless there is an abuse of discretion." *Beck v. Sapet*, 937 So. 2d 945, 948 (¶6) (Miss. 2006). We begin our discussion with an overview of the pretrial matters concerning this issue, including several hearings.

¶40. Early in 2022, Diming's counsel moved to depose Jakes. He explained at the January hearing on this motion that any deposition would not be "to elicit any information with respect to the alleged crime" but rather to question him about any alleged statements he may have made to the District Attorney "after he turned himself in." Diming's counsel also said he would possibly need to depose the District Attorney. He told the trial court he understood that Jakes "had a conversation with the [District Attorney]" and that interview was never produced by the State. He asserted that any statements Jakes had made were material to Diming's defense.

¶41. The Assistant District Attorney (ADA) who was at the hearing confirmed that he "was advised by the previous [ADA who] was on the case that [the District Attorney] in the presence of Mr. Jakes' counsel had met with Mr. Jakes and had had a conversation with Mr. Jakes with his counsel's permission." The ADA said that he "was not present for any conversation, there are not any recordings of that conversation, there are not any notes that [the District Attorney] took of that conversation." He said that he confirmed the conversation occurred, but he had not been informed of the substance of that conversation. The trial court denied the motion to depose Jakes.

¶42. In February 2022, Diming moved to compel the State to turn over statements Jakes

and Jamoni had made. At a mid-February 2022 hearing on this issue, Diming sought information about statements made by Jakes and also Jamoni[12] to the District Attorney. Diming asked the trial court to compel the District Attorney to sit for a deposition. As he stated at the earlier hearing, the ADA said he had not been on the case at the time, but understood that meetings between the District Attorney and Jakes and Jamoni and their counsel had taken place, but he did not know what happened at these meetings. In the course of the hearing, Diming's counsel requested that he be able to depose Jakes and Jamoni "[u]nder the circumstances of [the District Attorney's] infirmity or disability." The trial court denied Diming's motion to compel.

¶43. The record reflects that after the mid-February hearing, the ADA discovered handwritten notes "that summarized statements" Jamoni and Jakes made in interviews the District Attorney's office conducted. The ADA immediately informed defense counsel "and provided copies of the notes." He also confirmed with Jamoni's and Jakes's counsel that there had been no plea offer or agreement extended to either co-defendant.

¶44. At a February 22, 2022 hearing, Diming's counsel confirmed that he received the former ADA's notes that described the meetings. The former ADA testified at the hearing. She said that during one of the meetings, they discussed lowering Jamoni's bond to $10,000 if he would cooperate with the prosecution. She also confirmed that there was no discussion

---

[12] After the first hearing, Diming's counsel learned from the ADA that conversations had also taken place with Jamoni and that the former ADA had been present for at least some of those meetings.

of a plea deal. After the hearing, the State confirmed that there were no plea deals worked out with either co-defendant, and defense counsel agreed that the motion to compel information about the plea deal was moot.

¶45. The defense then moved to dismiss the indictment for *Brady*[13] and *Giglio*[14] violations. The State responded that any statements from Jakes and Jamoni were not exculpatory; the defense had the statements; neither Jakes nor Jamoni would testify at trial; and no plea deal had been made with either Jamoni or Jakes, so there was no *Giglio* violation. The trial court found the motion to compel was moot because the State had turned over the materials, even if later than usual. The trial court denied the motion to dismiss because it was an "extreme measure," and the defense had not met its burden of proof that Diming had been prejudiced. The trial court also found no proof of an intentional withholding of evidence or bad faith.

¶46. The supreme court has established a four-part test to determine whether a *Brady* or *Giglio* violation has occurred, thus requiring a new trial, as follows:

> The defendant must prove: (a) that the State possessed evidence favorable to the defendant (including impeachment evidence); (b) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable

---

[13] In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[14] In *Giglio*, the United States Supreme Court extended *Brady* to include material evidence affecting the credibility of witnesses. *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this [*Brady's*] general rule." (internal quotation marks omitted)).

diligence; (c) that the prosecution suppressed the favorable evidence; and (d) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*Manning v. State*, 929 So. 2d 885, 891 (¶15) (Miss. 2006); *accord Stewart v. State*, 291 So. 3d 738, 746 (¶30) (Miss. 2020). In making this determination, the supreme court has emphasized that "the question is whether there is a 'reasonable probability' that the verdict would have been different but for governmental evidentiary suppression which 'undermines confidence in the outcome of the trial.'" *Carr v. State*, 873 So. 2d 991, 1000 (¶11) (Miss. 2004) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). "[I]n any case, *Brady* requires a reasonable probability of a different outcome, *not a mere possibility*." *Montgomery v. State*, 891 So. 2d 179, 183 (¶8) (Miss. 2004) (internal quotation marks omitted).

¶47. Applying this four-pronged test, we find that Diming's claim fails. As an initial matter, Diming has not shown that the State possessed any evidence favorable to him that it did not disclose. We recognize that the State did not timely disclose the information, but the extenuating circumstances show that all the notes that the State had regarding interviews with Jamoni and Jakes were produced as soon as the current ADA discovered them. The defense acknowledged receiving this information. Diming suggests he was still prejudiced because the State did not make the District Attorney available to him, but Diming fails to show that the District Attorney possessed any knowledge or information not already disclosed to him. Nor has Diming made any showing that the outcome of his trial would have been different if the District Attorney had been made available for a deposition.

21

¶48. The supreme court's decision in *Montgomery* is instructive. In that case, the supreme court found that the defendant "fail[ed] to satisfy the first and third prongs of the four-prong *Brady* test." *Montgomery*, 891 So. 2d at 184 (¶10). The supreme court reasoned that although the defendant asserts "that the State suppressed favorable evidence[,] . . . [he] fails to show that the evidence was favorable or that the State even possessed the same." *Id.* Diming's claim fails for the same reasons here. The *Montgomery* court also noted, "Furthermore, there is no proof in the record that would allow this Court to decide whether the evidence allegedly suppressed was favorable or unfavorable." *Id.* Likewise, in this case, there was no proffer that would allow us to make that assessment here. Given this lack of proof on Diming's part, this Court finds the trial court did not abuse its discretion by denying Diming's motion for a new trial based on these alleged discovery violations.

## V.     Constructive Amendment

¶49. Diming asserts that Jury Instructions 10 and 11 constructively amended Counts 2 and 3 (capital murder charges) of his indictment because the instructions allowed the jury to find him guilty of "acting in concert" with Jamoni and Jakes, but he was not indicted for "aiding and abetting." Jury Instructions 10 and 11 had been submitted as S-3 and S-4. Diming made no contemporaneous objection to them. Because he failed to do so, this argument is procedurally barred. *Jones v. State*, 238 So. 3d 1235, 1239 (¶10) (Miss. Ct. App. 2016) ("Our supreme court has repeatedly held that an offended party's failure to object to jury instructions at trial procedurally bars the issue on appeal." (internal quotation mark omitted)).

22

¶50. In any event, we find that Diming's argument is without merit. "Jury instructions are generally within the discretion of the trial court[,] and the settled standard of review is abuse of discretion." *Moody v. State*, 202 So. 3d 1235, 1236-37 (¶7) (Miss. 2016).

¶51. We recognize that "[a] constructive amendment of an indictment is reversible per se," and this amendment occurs if "the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged." *Graham v. State*, 185 So. 3d 992, 1001 (¶25) (Miss. 2016). However, "[n]ot all variances between the indictment and instructions constitute a constructive amendment." *Id.*

¶52. This Court has found that an accomplice instruction may be given by the trial court even when accomplice liability is not charged in the indictment. *Wofford v. State*, 350 So. 3d 628, 639 (¶32) (Miss. Ct. App. 2022), *cert. denied*, 350 So. 3d 233 (Miss. 2022). As this Court explained in *Wofford*, although a defendant "may be indicted as a principal, a jury instruction based on accomplice liability is proper, provided that the evidence presented supports the instruction given." *Id.*

¶53. In the case before us, the indictment alleged that Diming, Jamoni, and Jakes killed Madkins and Gipson while the three men "were engaged in the commission of the crime of Armed Robbery." Although the indictment did not use the words "aid and abet" or "acting in concert," the indictment charged Diming with acting alongside Jamoni and Jakes to cause Madkins's and Gipson's deaths while the three carried out the robbery. The evidence

23

supported this instruction.[15]  Accordingly, we find that the indictment was not constructively amended by using the language "acting in concert" in the jury instructions because the indictment already contemplated the in-concert theory.  We therefore find that this assignment of error lacks merit.

### VI.    Ineffective Assistance of Counsel

¶54.    Diming appears to assert that his counsel was ineffective because his post-trial motion was "abandoned" when counsel did not set it for hearing.  It is true that the trial court noted in its order denying Diming's post-trial motion that Diming "abandoned" his motion, "having failed to bring the matter before the Court within a reasonable time for hearing."  However, as we discuss below, the trial court nevertheless found that the verdicts were supported by "substantial evidence presented at trial" and that Diming failed to show he was entitled to a new trial.  For the reasons addressed below, we find Diming's ineffective-assistance claim without merit.

¶55.    Typically, "ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings."  *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020).

---

[15] In particular, Pimpton testified that Jamoni came into the apartment, picked up Pimpton's 9-millimeter gun, and asked where "Little Tony" (Gipson) was.  Diming and Jakes then came through the door.  Pimpton testified that all three men had guns.  Diming told Pimpton to give him his money, and Pimpton gave Diming four to five hundred dollars. After Pimpton gave Diming the money, all three men forced everyone into the master bedroom.  Pimpton testified that he heard the men still asking for money.  Gipson told the men that the money was outside.  Jamoni left the room, got the money, and came back in. When Jamoni returned, someone said, "[K]ill everybody," and the guns started firing.

An ineffective-assistance claim, however, may be addressed on direct appeal when "[1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge . . . are not needed." *Id.* Relevant to this case, the appellate courts have "also resolved ineffective-assistance-of-counsel claims on direct appeal when the record affirmatively shows that the claims are without merit." *Id.* Upon review, this Court finds the record is sufficient to decide Diming's ineffective-assistance claim because he has failed to show that his lawyer's alleged deficient performance prejudiced his defense.

¶56. To prevail on an ineffective-assistance claim, "a defendant must prove that his attorney's performance was deficient," *Dartez v. State*, 177 So. 3d 420, 423 (¶19) (Miss. 2015), and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Diming cannot meet his burden of proof.

¶57. We recognize that the supreme court and this Court have found on direct appeal that a lawyer's complete failure to file a post-trial motion amounts to deficient performance, thus satisfying the first prong of the *Strickland* test. *See, e.g.*, *Pace v. State*, 242 So. 3d 107, 118 (¶30) (Miss. 2018) (holding that the "failure to file post-trial motions challenging the weight and sufficiency of the evidence constituted deficient performance"); *Woods v. State*, 242 So. 3d 47, 58 (¶50) (Miss. 2018); *Giles v. State*, 187 So. 3d 116, 125-26 (¶33) (Miss. 2016);

25

*Parker v. State*, 30 So. 3d 1222, 1235 (¶48) (Miss. 2010); *Holland v. State*, 656 So. 2d 1192, 1198 (Miss. 1995); *Ford v. State*, 333 So. 3d 896, 914 (¶51) (Miss. Ct. App. 2022); *Story v. State*, 296 So. 3d 104, 114 (¶27) (Miss. Ct. App. 2019).

¶58.    In each of these cases, however, the appellate court then emphasized that the defendant must also prove the second prong of the *Strickland* test—that he was *prejudiced* by the deficiency.  *Strickland*, 466 U.S. at 693.  That is, the defendant must show a "reasonable probability" that the trial court would have granted a new trial or JNOV had a proper motion been filed.  To be sure, in two cases Diming cites, the supreme court found that this test was met.  *Woods*, 242 So. 3d at 61-62 (¶62); *Holland*, 656 So. 2d at 1198.  But we find instructive here the numerous decisions in which the supreme court and this Court have found that although defense counsel's failure to file post-trial motions amounted to deficient performance, the defendant's ineffective-assistance claim failed because he did not show resulting prejudice—i.e., the courts found no "reasonable probability" that a post-trial motion would have been granted.  *Pace*, 242 So. 3d at 118 (¶31) (finding that counsel's failure to file a motion challenging the weight and sufficiency of the evidence "constituted deficient performance" but rejecting defendant's ineffective-assistance claim when he did not "show[] that any prejudice resulted from the failure . . . because . . . there is no reasonable probability that either motion would have been granted"); *Parker*, 30 So. 3d at 1235 (¶49) (rejecting defendant's ineffective-assistance claim when "[e]ven though the trial counsel's failure to move for a new trial constituted deficient performance," the defendant "failed to

26

show how the filing of a motion for JNOV or a new trial would have changed the outcome of the proceedings"); *Giles*, 187 So. 3d at 125-26 (¶33); *Ford*, 333 So. 3d at 915-18 (¶¶54-64) (finding that the defendant failed to show prejudice resulting from his lawyer's failure to file post-trial motions where there was no "reasonable probability" that the trial judge would have granted them had they been filed); *Story*, 296 So. 3d at 114 (¶27).

¶59.    In the case before us, Diming's counsel filed a detailed post-trial motion for a new trial or JNOV, unlike the lawyers in the above-cited cases who failed to file any post-trial motion at all.  But even if counsel's failure to set the motion for a hearing could be labeled deficient, we find that Diming has failed to show he was prejudiced by this conduct.  Indeed, although the trial judge noted that the motion had not been set for a hearing, he did not deny Diming's motion for that reason.  Rather, despite noting that no hearing had been set, the trial judge ruled: "Further, however, the Court finds that the verdict is supported by substantial evidence presented at trial" and that Diming had "failed to establish that he [was] entitled to a new trial."

¶60.    In addition to the trial court's order specifically denying the post-trial motion on these grounds, we have also addressed Diming's challenge to the weight of the evidence on appeal in Part I of this opinion.  As detailed above, we reject that challenge, finding that Diming failed to demonstrate that the verdicts in this case were "so contradict[ed] [by] the overwhelming weight of the evidence" that a new trial was warranted.  *Young*, 236 So. 3d at 55 (¶22).  For the same reasons, viewing the evidence de novo in the light most favorable

27

to the State, *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017), we find that the State presented sufficient evidence to support "each essential element" of the charges against Diming, and "a reasonable juror could rationally say that the State did [so]." *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010). We are thus bound to uphold the jury's verdict. *Ronk v. State*, 172 So. 3d 1112, 1129 (¶33) (Miss. 2015) (recognizing that in reviewing a sufficiency-of-the-evidence challenge, "[i]f any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt, this Court will not disturb the jury's verdict").

¶61. In sum, Diming has failed to show a "reasonable probability" that the trial judge would have granted the motion for a new trial or JNOV that his counsel filed. Because Diming has failed to show any "prejudice" from his counsel's performance, we find that his ineffective-assistance claim is without merit.

¶62. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**